■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. WILLIAM A. MAYNARD, JR., Appellant.— Judgment of the Supreme Court, New York County, rendered February 4, 1971, convicting defendant, after trial before Davidson, J. and a jury, of manslaughter in the first degree [former Penal Law, § 1050] and sentencing him to imprisonment of not less than 10 nor more than 20 years, affirmed. This is the third trial of this case, the first two having ended respectively in a disagreement and a mistrial. Two eyewitnesses saw the defendant shoot and kill Marine Sergeant Kroll and a third eyewitness, who had been watching Maynard during an earlier confrontation, saw Maynard in immediate flight from the scene of the shooting. The record shows that Maynard's guilt was established beyond a reasonable doubt. It was not error to reject the testimony of one Levy with reference to street lights. The People's witness Weinstein, Deputy Director in charge of the Engineering Division of the New York City Bureau of Gas and Electricity, had been called as a witness by the People to establish the existence of light fixtures. He was not called as an expert to give opinions on lighting effects. The so-called expert testimony that he gave was testimony elicited for the first time during defendant's cross-examination of Weinstein. Counsel by its cross-examination had made Weinstein his own witness on these subjects, and the trial court's ruling that defendant may not call Levy as an expert witness to contradict expert testimony elicited by him was within the bounds of its discretion. As is said in Bender's New York Evidence, (vol. 1, § 27.03): "Normally, strict order of proof requires that when a party desires to examine an adversary's witness on matters outside the scope of cross-examination, he must call that witness as his own for direct examination. In actual practice, this rule is usually relaxed when a cross-examiner brings up new matter. However, when that occurs, the witness then becomes the witness of the adverse party who is bound by the answers. Such witness, when questioned on new matter, may not be contradicted by other evidence." We have examined the other assignments of error and found them to be without merit. Concur — Kupferman, McNally and Tilzer, JJ.; Stevens, P. J., and Murphy, J., dissent in the following memorandum by Murphy, J.: We cannot vote to affirm this conviction because of the numerous errors committed at the trial; some of which are discussed below. The defendant was convicted of manslaughter in the first degree and sentenced to imprison-

ment for an indeterminate term of not less than 10 nor more than 20 years. A sailor, Robert Crist, testified he was accosted by James Barnhardt in Greenwich Village and that he thereafter chased and struck him. A police officer separated these two antagonists and walked the purported homosexual away from the altercation. Defendant Maynard, together with a male companion, then berated Crist for striking the older and smaller man. An argument developed among these three persons which lasted from two to five minutes and terminated when Sgt. Kroll arrived on the scene; and Maynard and his male companion departed. Kroll and Crist decided to continue the argument and drove, in Kroll's car, after Maynard and his companion, catching up with them on West 4th Street between Sixth. Avenue and McDougal Street. Two witnesses, Crist and Dennis Morris, testified they saw defendant shoot the decedent Kroll in the face with a sawed-off shotgun. Michael Febles also identified the defendant as the person he saw arguing with Crist and, although he did not see the actual shooting, he testified that he heard the shotgun blast, saw Maynard and his accomplice run away and observed the accomplice throw an object to the ground. Howard Fox, a cab driver, testified that at 1:10 in the afternoon of the day before the shooting, he drove Maynard and another person to Greenwich Village and that Maynard's companion had a camera bag over his shoulder. Defendant Maynard claimed he was not in Greenwich Village, but at his wife's family's home in Queens; and that although he was separated from his wife he was still friendly with her brother, Michael Quinn. At the first trial the Quinn family testified they did not know defendant's whereabouts on April 2–3, 1967, although they had previously executed affidavits averring that he was in the Quinn household during that critical evening. However, at this trial they supported Maynard's alibi and claimed they were coerced into giving false statements at the first trial by Assistant District Attorney Gallina. The prosecution's case relied principally on the identification testimony of Robert Crist, Dennis Morris and Michael Febles. The street lighting, the opportunity of the witnesses to observe the killer, the police identification procedures, and whether the alibi witnesses were telling the truth at the first trial or at this trial were among the contested issues at the trial. The prosecution called, as its second witness, Irving Weinstein, an expert in street lighting. His testimony dealt with the lighting conditions on the streets where the crime was committed, as well as the area where the identification witnesses had seen the defendant. Weinstein testified to the kind of lighting as well as its amount. From tests he took in May of 1969, he concluded that the average light in the area was 1.5 foot-candle and that this meant that one with 20-20 vision could read small print of a newspaper, albeit with difficulty. He conceded that the needle of a light meter barely moved and that his conclusions were arrived at mathematically. He testified that he had a reasonable degree of professional certainty that the mathematical formula he used to calculate the amount of foot-candles was reliable, and that the lighting in this area was twice the standard set as the proper standard for the City of New York. He also gave his opinion that if the windows in the bank on the southeast corner of West Fourth Street and Sixth Avenue were lit, visual observation would be aided because objects would be seen against the illuminated background, and that "silhouette lighting" made it easier to see faces and features. On its case, the defense attempted to call Charles Levy, a lighting consultant, to give expert testimony on the same subject matter as that testified to by Weinstein. The court sustained the prosecutor's objection to this witness. We believe this was error of such a nature as to deprive defendant of a fair trial and, alone, mandates a reversal. The issue of the lighting is an

integral part of the identification evidence on the night of the crime. The People, in an effort to make the identifications more believable to the jury, paint a picture of streets lit twice the standard for New York City. It defies reason to deny the defense the right to meet this issue, especially since the offer of proof makes clear that Levy would have rebutted Weinstein's principal points as well as the lay witnesses who were permitted to give opinions on lighting. (Cf. *People* v. *Dewey*, 23 A D 2d 960; *People* v. *Jackson*, 10 N Y 2d 510.) The District Attorney's summation refers to Weinstein's testimony to establish that the identifications were made on a "well-lighted street"; and the court's charge that in determining the accuracy of the identifications the jury should consider "the lighting conditions", merely magnify the gravity of the preclusion. It was also error to receive in evidence, as the court stated, "as an admission by conduct" the testimony of Howard Fox that when he, Fox, came into the room where defendant was being held in police custody, the defendant looked at Fox, Fox looked at the defendant, and the defendant then turned his head to the left. The District Attorney's argument that defendant "in effect recognized him and turned away" is not borne out by the testimony since Fox stated he did not know why defendant turned his head. Nevertheless, the District Attorney in his summation said that this was another piece of evidence tying this defendant to the murder: "not only did Mr. Fox identify the defendant, the defendant identified Mr. Fox, recognized Mr. Fox, that this was the guy in the cab. He turns his head." Both the court's ruling and the summation were improper and error, prejudicial to defendant. (Cf. *People* v. *Mezzapella*, 19 A D 2d 729.) We further believe that it was error to have admitted into evidence People's Exhibits 21 and 40, a tan plastic bag and its contents. These exhibits were not sufficiently connected to the defendant or the crime. The cab driver, Fox, testified he saw a bag "something like" this bag in possession of the defendant 15 hours before the crime and one of the eyewitnesses, Febles, testified he saw an "object" thrown into the street by the defendant's accomplice; but it "could have been anything". There is no evidence that People's Exhibit 21 was the object thrown down or that this bag, which was found on the steps leading to the basement of a building one block north of where Kroll was killed, was the same "something like" the object the cab driver saw 15 hours earlier. Without a proper foundation, its receipt into evidence was error. (See McCormick, Evidence, § 179.) The identification witnesses, Crist, Morris and Febles, gave descriptions which do not match defendant. Crist had been drinking since 9:00 P.M. and conceded he was probably intoxicated. He remembers virtually nothing concerning that night, not even the people he spoke to, including the police. After he had seen the defendant on May 17, 1967, at the Sixth Squad, he was shown photographs of the defendant on three or four occasions; and before the Grand Jury in October, 1967, when shown defendant's photo, he said he cannot be sure if it's the same man. At the trial he identified the defendant. Dennis Morris picked defendant out of a lineup a few days before the first trial in 1969. On August 2 and 3, 1967, he was not sure defendant was the assailant even though two pictures of defendant were placed with seven other pictures. The suggestive reshowing of the pictures resulted in a positive identification from photographs before the Grand Jury although he did not see defendant in person. Febles' observations (like Morris') were extremely limited. "By chance" he was taken to court by Lt. Stone and was told he was going to see the defendant in the case and then identified the defendant at the courthouse; not in a lineup. At the *Huntley* hearing, held prior to the first trial, Lt. Stone and Detectives Hanast and O'Brien testified that on May 17, 1967 the defendant was advised

of his "Miranda" rights and waived them, signing a form to that effect. Defendant testified that it was not his signature nor his handwriting and that he did not sign the form. He produced samples of his handwriting. At a recess the prosecutor, unable to find the original of the form, withdrew the carbon copy that had been received in evidence. The issue not having been litigated, defense counsel at the beginning of this trial, in support of a motion for a new *Huntley* hearing, offered to prove that Russel Osborne, a handwriting expert, "has preliminarily concluded that the defendant did not sign (the form) but in fact some other person did." The court denied the application without reference to the forgery issue. During the trial the issue was again raised on cross-examination of Lt. Stone by defense counsel's attempt to question the witness as to the signature on the form. The objection was sustained as academic since the People did "not intend to introduce it in evidence." We believe inquiry should have been permitted of those officers at the pretrial hearings and at the trial, since their credibility has been seriously challenged. If the defense was able to show that the defendant's signature or any variation of it was not on that form, the integrity and reliability of the entire investigation is undermined. (See 2 Wigmore, Evidence [3d ed], § 277.) The identification procedures were established by the police by photos, showup and lineups as well as the oral statements of defendant. If, then, defendant could sustain a charge of police fabrication, it would weigh heavily against the prosecution before the jury on those issues and it does not seem reasonable to allow a conviction to stand in light of such a serious allegation. It also seems that with this issue not before the jury, the prosecutor felt free in summation to discuss, as he did, the integrity, honesty and truthfulness of the police. He may have been correct in his estimate of the police who testified, but no one will know until it is properly tested. A new hearing and a new trial is mandated on this issue. Michael Quinn was the first alibi witness called by the defense. His direct testimony materially contradicted the two statements he gave to Assistant District Attorney Gallina and the testimony he gave at the first trial. He testified that the evidence he gave at the first trial was false and that he had been "forced to lie" by Gallina and that his testimony had been rehearsed by Gallina. After completing his testimony, the courtroom was cleared and the court directed that the proceedings be presented to the Grand Jury and that the District Attorney's office determine whether there had been perjury or a conspiracy to obstruct justice. It is our opinion that the atmosphere created by the court's action denied defendant an impartial trial in that it affected the remaining alibi witnesses, several of whom were related to this witness. It seems to us that the threat of arrest and indictment could only result in intimidating the other defense witnesses and was calculated to have a chilling effect on their attitudes and testimony. (Cf. *People* v. *Frasco,* 187 App. Div. 299; *People* v. *Davison,* 3 A D 2d 724.) These investigations could have awaited the end of the trial and been conducted in a calm, noncoercive atmosphere. Three of the alibi witnesses testified at this trial that they had been coerced into giving false statements and false testimony at the first trial. Before the first trial Michael Quinn was held as a material witness after having been brought to Assistant District Attorney Gallina's office, where he made the statement he gave at this trial. He was committed to jail on $100,000 bond. Giselle Quinn, who was not then Michael's wife, testified that, at the same time, she had a conversation with Mr. Gallina and was committed to civil jail on $75,000 bond. Michael had seven interviews with Mr. Gallina. On May 8, he testified, he changed his story because Mr. Gallina told him that

Giselle (a German national) would be deported and that he would be kept in jail until Christmas. After he changed his statement Mr. Gallina also promised to take care of an auto larceny charge which had been pending for three years. Giselle testified that she was questioned every day by Mr. Gallina during her two weeks' commitment, and also conversed with an immigration officer. When Michael changed his statement, they were both released. Assistant District Attorney Gallina testified that he always expected to call Michael as a rebuttal witness, not as a prosecution witness, and that he only wanted to determine the truth of the alibi. We believe the conduct of Mr. Gallina to be contrary to law and to his authority, and that a court process was used as a tool wrongfully to detain and interrogate defense witnesses. (Cf. *People ex rel. Van Der Beek v. McCloskey*, 18 A D 2d 205.) Since the witnesses were released as soon as Michael's statement was changed, the motives of Mr. Gallina became suspect. Additionally in this regard, the court's refusal, upon timely request, to properly instruct the jury on its options, where an assertion is made that a witness' prior statements and testimony were made under duress, was error, as a matter of law. The scope and content of Assistant District Attorney Gallina's testimony was prejudicial and denied defendant a fair trial. He testified as to his motives for arresting the witnesses, to clearly hearsay material, and to his opinions of the case. He stated that his investigation showed defendant was a violent man, that he had witnesses who identified defendant as the killer, that he believed defendant guilty of the crime, and that the evidence left no doubt defendant was the killer. Mr. Gallina stated his conclusions while allegedly retelling his conversations with Michael Quinn. Further, in summation, the trial assistant, over objection, improperly vouched for Mr. Gallina's testimony and equated him with the tradition and integrity of the office of District Attorney. It is thus apparent that Mr. Gallina was improperly permitted to bolster the People's case and to add the prestige of his office thereto. (Cf. *People v. Colascione*, 22 N Y 2d 65.) Finally, we note that it was error to prevent the defense from rehabilitating its witnesses after impeachment and to prohibit impeachment of prosectuion witnesses. (*People v. Buchalter*, 289 N. Y. 181; *Urbina v. McLain*, 4 A D 2d 589; *Ryan v. Dwyer*, 33 A D 2d 878; *People v. Sorge*, 301 N. Y. 198.) For the afore-mentioned reasons, and all of them collectively, we would reverse the judgment of conviction and remand for a new trial.