■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BENJAMIN SEEGARS, Appellant.—Judgment of the Supreme Court, Bronx County (Harold Silverman, J., at hearing; George Donald Covington, J., at trial), convicting defendant of robbery in the first degree, and sentencing him, as a persistent violent felony offender, to an indeterminate term of imprisonment of from 25 years to life, reversed, on the law, and the matter remanded for a new trial.

Defendant was convicted of the robbery and stabbing of a 69-year-old woman as she was about to enter her apartment, located at 209 East 165th Street in Bronx County, at approximately 1:30 P.M. on the afternoon of April 3, 1984. The victim's screams were heard by Selvin Evans who testified that he looked through the peephole of his apartment door and saw the left side of the attacker's face as he held the victim. After coming to the victim's aid, he stated that he saw the attacker again from a distance of about 15 feet when the man turned and faced him after running down the stairs.

Theodosia Mathis, who was outside on the street, testified that she also heard screams and recognized her friend's voice. She observed a man leaving the building, clutching something under his right arm. She ran after him as he ran towards Sherman Avenue and yelled, "Someone stop him because he just mugged Miss Lee." She continued to observe the man from the corner as he ran down Sherman Avenue until he turned right onto 166th Street.

Maximiliano Zayas testified that he and another witness, Larry Holland, who was not called by the People, were around the corner from the victim's apartment in front of 1055 Sherman Avenue, located approximately 100 feet from the intersection with 165th Street, where they saw a woman pointing and yelling "Stop that man, stop that man, he just mugged Miss Lee." The man, whom Zayas later identified as defendant in a show-up, ran north on Sherman Avenue on the opposite side of the street and, at a point directly in front of Mr. Zayas, pointed towards the corner of 165th Street and Sherman Avenue and yelled, "Call the police, call the police, somebody's just been stabbed." Zayas stated that defendant, whom he observed traverse the entire block, carried an object under his right arm with a burgundy strap hanging from it. The weather was bright and clear and the witness' view was unobstructed.

Detective Investigator ("DI") Charles Engel testified that he and his partner, John Murphy, were travelling in an unmarked car which was stopped at a light, facing south on Sherman Avenue at the intersection with 166th Street. He observed a man, whom he identified as defendant, running north towards them carrying something concealed under his arm. Defendant made a right turn heading east along 166th Street and turned left onto Grant Avenue, heading north. The DI's made a left onto 166th Street and followed defendant around the corner to the vicinity of 1117 Grant Avenue, where they exited their vehicle with their shields exposed,

identified themselves as police officers and ordered defendant to stop. Defendant halted and turned around, keeping his right hand under his jacket. DI Engel observed a strap hanging from the jacket and heard his partner say, "He has a gun." The officers drew their weapons and approached defendant, who threw a maroon pocketbook with a strap at DI Murphy. The officers attempted to restrain defendant, but he broke free and ran back down to 166th Street and turned left, heading east, pursued on foot by DI Murphy. Engel followed them down 166th Street by car, turning left onto Morris Avenue, where defendant went into an alleyway at number 1109, located on the west side of the street. The officers ran to the back of the alley but "lost sight" of defendant.

Engel and Murphy then drove to 166th Street and Morris Avenue where they encountered two uniformed officers with a black female witness in the back seat of their squad car (Mathis). The uniformed officers informed them that an elderly woman had been stabbed and her pocketbook stolen. Engel and Murphy realized that the description of the suspect and his clothing matched the appearance of the man they had been chasing. DI Engel and his partner proceeded to the crime scene where they saw the victim lying on the sidewalk. She was receiving aid from Emergency Medical Service personnel who told them that her injuries were serious and that she might have been stabbed in the heart.

The officers started a search of the area and, after about four minutes, returned to the location where they had lost sight of defendant, parked the car and walked up the alleyway. There, Engel testified, he saw defendant, crouching behind a car parked on the other side of the alley and looking straight at him. DI Murphy explained that the officers proceeded down the alley, went behind the building and walked back up an alley on the other side which leads back to Morris Avenue. It is here that they encountered defendant. Upon confronting him, the officers managed to detain him but were unable to subdue him and place him in handcuffs until other officers arrived and rendered assistance. A grey jacket matching the description of the one worn by the fleeing suspect was discovered on the ground in front of the car. A blood-stained knife was found lying underneath the front bumper.

Show-up identifications were conducted at Lincoln Hospital where the victim had been taken for treatment of her injuries. As she was unable to identify defendant at trial, evidence of her prior identification of defendant was admitted pursuant to CPL 60.25. Detective Investigator Engel testified that defen-

dant was struggling and yelling, exclaiming at one point, "Tell them I didn't do it, I didn't do it, I didn't mean to hurt anybody." From his position behind defendant, Engel did not hear the victim identify defendant as her assailant. However, his partner, Murphy, and the victim herself both testified that she made a positive, in-hospital identification of defendant as the man who stabbed and robbed her.

Maximiliano Zayas also testified that he was brought to Lincoln Hospital to identify defendant. He was accompanied by Larry Holland, who did not testify. He and Holland were transported from the Precinct House, where they had been looking through photographs, to the hospital emergency room where defendant was exhibited to them in a hallway, in handcuffs and in the custody of uniformed officers.

The victim's description of defendant was not entirely consistent with his appearance. Upon cross examination, she admitted that she had told police that her attacker wore a black, leather jacket when a grey, cloth jacket was recovered from the alley where defendant was apprehended. She also stated that her attacker had no beard or mustache when a photograph taken shortly after defendant's arrest shows him to have both. Moreover, neither Theodosia Mathis nor Maximiliano Zayas described the fleeing suspect as having a beard, although both did state that his complexion was "very dark."

It was the theory of the defense that the description of the man observed running away from the crime scene who was pursued by Detective Investigators Engel and Murphy did not match the description of defendant who, following an interval of some 15 or 20 minutes, was arrested by them in the alley. Defendant contends that the show-up identifications made at the hospital by the victim and by Zayas should have been suppressed.

While exigent circumstances justified the identification made by the victim at the hospital *(People v Riley,* 70 NY2d 523, 529; *People v Rivera,* 22 NY2d 453, 455), there was no reason for the use of unnecessarily suggestive procedures in obtaining an identification from any other witness *(People v Styles,* 156 AD2d 223, 224; *see also, People v Adams,* 53 NY2d 241, 249). Given the identification made by the victim, the procedure employed is not rendered tolerable in the interest of prompt identification *(People v Love,* 57 NY2d 1023, 1024). The showup was not proximate to the commission of the crime in either time or space *(cf., People v Brnja,* 50 NY2d 366, 372) and, in any event, neither the People nor the dissent have

indicated any reason that conducting a lineup would have been unduly burdensome *(People v Riley,* 70 NY2d 523, 529-531, *supra; People v Styles, supra,* at 224). Finally, it cannot be said that the record contains a sufficient independent basis for the identification of defendant to render the error harmless *(People v Adams, supra,* at 252). The viewing of defendant by Zayas, in handcuffs and in the custody of uniformed officers, in the hallway near the victim's hospital room renders the circumstances highly suggestive and requires suppression.

Further error was committed when the court marshalled the evidence in a manner prejudicial to the defense *(see, People v Shaw,* 160 AD2d 393). Several pages of the record are devoted to the People's identification evidence against defendant and a mere two sentences to the defense of misidentification. Moreover, while repeatedly emphasizing the victim's in-hospital identification of defendant as her assailant, the court failed to mention the inconsistencies in her description of his jacket and facial hair, rendering the charge unbalanced *(People v Hall,* 155 AD2d 344, 346). The court also summarized the circumstantial evidence without any mention of defendant's position that he was not the same man who struggled with the police, abandoning the victim's pocketbook, and who later discarded the knife and jacket in the alley *(see, People v Roman,* 149 AD2d 305, 307). Given the importance of the identification issue and the inability of the victim to identify defendant at trial, these errors cannot be considered harmless.

Finally, the court's constant and detailed recitation of the charges against defendant in the course of instructing the jury unduly inflamed the passions of the jurors and deprived defendant of a fair trial.

We have examined defendant's other contentions and find them to be without merit. Concur—Rosenberger, J. P., Wallach and Rubin, JJ.

Kassal and Smith, JJ., dissent in a memorandum by Smith, J., as follows: Because I believe the defendant was convicted by overwhelming evidence following a trial which was fair, I dissent. First, in the context of this case, the showup identification procedure at the hospital was neither an error nor unfair. Even if it was error, the error was harmless beyond a reasonable doubt. *(People v Crimmins,* 36 NY2d 230 [1975].) Second, the charge as a whole was entirely fair.

Briefly stated, the evidence was as follows. On April 3, 1984 the complainant, a 69-year old woman, was grabbed around her neck, stabbed twice in the chest and robbed of her pocket-

book as she attempted to enter her second floor apartment in the Bronx. While the complainant could not identify the defendant at trial, she did identify him in a hospital show-up shortly after the stabbing.

Around 1:30 in the afternoon on the same day, Special Agent Charles Engel and Detective Investigator John Murphy were in plain clothes in an unmarked car near Sherman Avenue and 166th Street. They observed the defendant running northbound on Sherman Avenue holding something under his jacket as though carrying a football. The man darted into the entranceway of a building and then came out immediately. He kept "looking back and forth from side to side." (Engel) The officers followed the defendant. When they approached him, they noticed a strap hanging from his jacket. They drew their guns, believing the strap to be part of a holster. When the defendant was directed to approach the officers, he began to do so and then threw a handbag, the handbag of the complainant, at them. Although there was a struggle, the defendant broke away and the officers lost him after a chase.

Shortly after this occurrence, the officers learned of the stabbing of the 69 year old woman. They resumed their search for the defendant and found him crouching along the wall of a building and near a car. After a struggle and after additional police officers had arrived, the defendant was subdued. A knife and a jacket were found a short distance away.

The defendant was taken to Lincoln Hospital and shown to the complainant. At the hospital the defendant kept yelling that he was not the man. He also yelled that he did not mean to harm the woman. At first the complainant was unable to identify the defendant. When he was brought closer to her, she did identify him.

Two other people were brought to the hospital to view the defendant. One, Maximiliano Zayas, identified the defendant there. The other, Larry Holland, did not.

Under the circumstances of this case, it was not error to show the defendant to two witnesses other than the complainant. Both Zayas and Holland had seen someone, presumably the perpetrator, running from the scene. The complainant in the hospital was a 69 year old woman who had just been stabbed twice in the chest. The person whom the police had taken into custody was protesting his innocence. In my view, the police had an obligation to make sure that they had the right man or to continue a prompt investigation if the identifi-

cation was not made. It is of some significance to the issue of fairness that one of the persons, Larry Holland, could not identify the defendant.

Despite the majority's assertion that the showup was not proximate to the crime within either time or space, the evidence reveals that the robbery occurred about 1:30 P.M., that there was an immediate search for the perpetrator, that the defendant was apprehended around 1:50 P.M., that the initial showup and identification by the victim occurred fifteen minutes after defendant's apprehension and that the other two showups occurred within ten minutes thereafter. A lineup would have delayed any further search for a perpetrator.

Second, a reading of the whole charge indicates that it was fair. The court instructed the jury that the defendant had pleaded not guilty and had thus denied his guilt. It repeatedly stated that the burden of proof was on the People to prove the guilt of the defendant beyond a reasonable doubt.

The majority's characterization of the court's charge as a "prejudicial" marshalling of the evidence, particularly with respect to the complainant's identification, is simply not borne out by a reading of the charge. The majority states as follows: "Further error [hospital showup] was committed when the court marshalled the evidence in a manner prejudicial to the defense *(see, People v Shaw,* 160 AD2d 393). Several pages of the record are devoted to the People's identification evidence against defendant and a mere two sentences to the defense of misidentification. Moreover, while repeatedly emphasizing the victim's in-hospital identification of defendant as her assailant, the court failed to mention the inconsistencies in her description of his jacket and facial hair, rendering the charge unbalanced *(People v Hall,* 155 AD2d 344, 346)."

The court did not marshal the evidence on identification. On this issue the court gave (1) a general charge on identification, telling the jury the things it should look for, (2) a charge, in accordance with CPL 60.25, as to the identification of a defendant where the complainant has no present recollection of the defendant (here the complainant's testimony concerning the show-up at the hospital and the police officer's testimony that the defendant in court and the person identified at the hospital were the same person was sufficient identification under CPL 60.25), (3) the contentions of the People on identification and (4) defendant's contention that he was wrongly identified.

What the majority appears to be pointing to in saying the

court marshalled the evidence on identification is the court's summary of the contentions of the People as to identification. Thus the court stated that in addition to the complainant's testimony, the People contended that the following evidence established identification: "One: Possession by the defendant of the complainant's pocketbook. Two: Possession by the defendant of the clothing matching the alleged perpetrator's clothing. Three: Defendant's apprehension in close proximity to a blood stained knife. Four: People's witnesses' testimony to later seeing the man fleeing the scene. At the hospital, some forty minutes later (sic)."

With respect to the People's contention that the defendant possessed a pocket-book, the court gave a proper charge on the possession of fruits of stolen property, including the words "in no sense are you required to infer, that the possessor of the property, the defendant, is guilty of the crime of robbery in the first degree". With respect to the clothing worn by the perpetrator, the court stated, "In the latter regard you should examine with care the witnesses' opportunity during the commission of the crimes to observe and remember the facial features, the body size, the hair, the skin and clothing of the perpetrator." With respect to flight, the court gave a proper charge, a portion of which was that "[s]uch evidence is ordinarily of slight value."

The court stated repeatedly during its identification charge that the jury must consider "all of the evidence" or the "total evidence." Finally, during its identification charge the court gave the contention of the defendant. It stated, "The defense contends that Miss Aline Lee made a mistaken identification of the defendant as the perpetrator at the hospital emergency room, that because of such mistaken identification the wrong man is on trial in this courtroom."

The majority also criticizes the trial court for not stating the defendant's contention of wrong identification during the circumstantial evidence charge. The majority states: "The court also summarized the circumstantial evidence without any mention of defendant's position that he was not the same man who struggled with the police, abandoning the victim's pocketbook, and who later discarded the knife and jacket in the alley (see, People v Roman, 149 AD2d 305, 307)."

The language quoted from the charge as to the defendant's contentions, as well as several other portions of the charge, make clear what the defendant's contention was.

The conviction should be affirmed.