864

[948 NE2d 920, 924 NYS2d 314]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TERRELL GILFORD, Appellant.

Argued March 23, 2011; decided May 3, 2011

### APPEARANCES OF COUNSEL

*Office of the Appellate Defender*, New York City (*Rosemary Herbert* and *Richard M. Greenberg* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Justin J. Braun, Andrew S. Holland, Joseph N. Ferdenzi* and *Nancy D. Killian* of counsel), for respondent.

### OPINION OF THE COURT

MEMORANDUM.

The order of the Appellate Division should be affirmed.

At 2:00 A.M. on Monday, March 8, 2004, a fight erupted on the dance floor at "Skate Key," a now-defunct indoor roller skating rink in the Bronx. By the time the combatants were spent or separated, James Earl Jones had suffered what turned out to be a mortal stab wound in the chest, and Kyle Williams had

suffered potentially life-threatening stab wounds in the stomach and back. A female witness who was standing within inches of Jones when he was stabbed helped him outside where he collapsed in the street. She immediately and spontaneously identified defendant Terrell Gilford as Jones's attacker to a police sergeant assigned to the area outside Skate Key, who asked if anyone knew who stabbed the victim. Defendant fled on foot, with the sergeant and witness in pursuit.

Two uniformed police officers, who were notified at 2:15 A.M. of an assault in progress, joined in the chase in their patrol car and finally caught up with defendant a few blocks away from Skate Key. They handcuffed defendant with his hands behind his back and placed him in the back seat of their cruiser. The sergeant instructed these two officers to transport defendant to the nearby hospital where Jones had been taken by ambulance, and to conduct a showup. At the time, the sergeant suspected that Jones was "probably going to lose his life."

When the two officers reached the hospital, one of them stayed with defendant in the car, which was parked in the emergency room parking lot. The other officer went into the hospital where he learned Jones's name, and discovered that he was "unconscious" and "being worked on," rendering a showup impossible. On his way out of the emergency room, though, he ran into the witness and a male companion, who were walking quickly in his direction. In light of their distraught and rushed appearance (the witness appeared to have been crying), the officer, acting on a hunch, asked them why they were there. When the witness responded that "her friend" James Jones had been stabbed, the officer asked the two of them "if they knew anything about what had happened at the Skate Key and they said that they did." He then "asked them if they would be able [to] in any way . . . identify any suspects involved in the case and they also said they would." The officer did not know that the witness had already identified defendant to the sergeant as Jones's attacker.

The officer radioed for a patrol car. He explained to the witness and her companion that he would place them in this car to "view someone" or to "show [them] someone who might have been involved in the incident." Once this patrol car arrived, the witness and her companion climbed inside, and the officer told them that he was going to "put a bright light on the individual [whom he] would show them and that at any time if they identified that person they should let [him] know." The officer next

called on the operator of the newly-arrived patrol car to turn on the "take-down" lights on top of the vehicle. At the officer's signal, his fellow officer then guided defendant, who remained rear-handcuffed, to the lighted area and stood next to him. When the officer asked the witness and her companion if they could identify defendant, the witness said, "[T]hat's him," and her companion agreed. The witness related to the officer that "the person [whom he] had shown them was responsible for injuring Mr. James Jones, specifically stabbing him"; the stabbing took place inside Skate Key; "there was a confrontation amongst people"; and defendant "had a knife and . . . had stabbed [Jones]." Her companion added "that there was a fight and . . . he also observed [defendant] to have a knife in his possession." This showup took place at about 2:45 A.M., no more than 45 minutes after the crime.

On April 1, 2004, the grand jury indicted defendant for a litany of crimes in connection with the fight at Skate Key. Defendant moved to suppress the showup identifications. Defense counsel argued that there were no exigent circumstances with respect to the witness or her companion; that the officer improperly conducted a joint or simultaneous showup with the witness—who had already identified defendant just minutes before—and her companion; that the officer told them that defendant was a "suspect"; that defendant was "spotlighted" by "take-down" lights; and that defendant was removed from a police car, wearing handcuffs, and flanked by police officers in plain view of the witness and her companion. Defense counsel further maintained that the showup was impermissibly duplicative because the police officers had to have known that a showup was unnecessary to establish probable cause since defendant was already under arrest.

The judge denied defendant's motion, citing *People v Duuvon* (77 NY2d 541 [1991]). He found that the "chain of events" in this case was "unbroken," related in temporal and geographic proximity and, in addition, driven by the exigency of the victim's critical condition; and that "the show-up took place within a short period of time after the commission of the crime and in close proximity to the scene of the crime." Further, he concluded, the showup was conducted to "preserv[e] . . . the witnesses' 'fresh memories' of the event," and "[t]he fact that [defendant] was identified in front of a police car while in handcuffs [did] *not* render the show-up unduly suggestive."

Defendant subsequently waived his right to a jury and was tried in a bench trial before the same judge who presided over

the suppression hearing. At the trial, the witness made an in-court identification of defendant as Jones's attacker; Williams testified that defendant had stabbed him in the stomach. The judge acquitted defendant of the most serious of the charges facing him for Jones's death—second-degree murder—but convicted him of first-degree manslaughter. The judge also acquitted defendant of the most serious of the charges with respect to Williams—attempted murder in the second degree—but convicted him of first-degree assault.

On appeal, the Appellate Division upheld defendant's first-degree manslaughter conviction. Exercising its interest-of-justice jurisdiction, the court reviewed defendant's unpreserved challenge to the first-degree assault conviction and reduced it to first-degree attempted assault (65 AD3d 840, 841 [1st Dept 2009]). Finally, the court found "no basis for suppression of the showup or in-court identifications, because the showup was within permissibly close temporal and geographic proximity to the crime, took place shortly after the witness had already made a reliable identification, and was conducted in a manner that was not unduly suggestive" (*id.* at 841-842 [citations omitted]).

The due-process inquiry for showups calls upon the suppression court to decide whether the showup was reasonable under the circumstances—i.e., justified by exigency or temporal and spatial proximity—and, if so, whether the showup as conducted was unduly suggestive (*People v Ortiz*, 90 NY2d 533, 537 [1997]). Whether a showup is reasonable under the circumstances and/or unduly suggestive are mixed questions of law and fact. As a result, the determination of the hearing court in this case, undisturbed by the Appellate Division and supported by evidence in the record, is beyond our further review.

Finally, defendant's claim that the evidence was insufficient to show his intent to cause serious physical injury to Williams is unpreserved.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed in a memorandum.