[10 NYS3d 214]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS CRUZ, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KAREEM SANTIAGO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DIMITRI MARSHALL, Appellant.

First Department, June 2, 2015

## APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society*, New York City (*Frances A. Gallagher* of counsel), for Thomas Cruz, appellant.

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Mark W. Zeno* and *James D. Gibbons* of counsel), for Kareem Santiago, appellant.

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Eunice C. Lee* of counsel), and *Fried, Frank, Harris, Shriver & Jacobson LLP*, New York City (*Victorien Wu* and *Jennifer L. Colyer* of counsel), for Dimitri Marshall, appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Susan Axelrod* of counsel), for respondent.

## OPINION OF THE COURT

GISCHE, J.

Central to each of these appeals is the issue of whether a showup identification of the defendants made by the complainant in a nearby garage, approximately one hour after a 911 call reporting a crime, is unreliable because it was the product of an unduly suggestive procedure. Police officers Myskowsky and Mitchell were the only witnesses who testified at a *Wade* hearing challenging the identification. They were credible witnesses and the facts regarding the circumstances of the showup identifications are not disputed.

In reviewing the propriety of the showup identification we are, of course, limited to consideration of only the evidence presented at the suppression hearing (*People v Riley*, 70 NY2d 523, 531-532 [1987]; *see People v Gagner*, 59 AD3d 963, 963 [4th Dept 2009], *lv denied* 12 NY3d 816 [2009]). The dissent's consideration of facts later adduced at trial cannot be relied upon to substantiate an otherwise improper pretrial identification.

The following facts were adduced at the suppression hearing: The complainant was attacked at night by a group of men as she walked home from work along West 90th Street on the uptown side between Columbus and Amsterdam Avenues. She

was thrown to the ground, punched, and kicked, and her bag was taken from her. Her assailants then fled through a housing complex, heading uptown towards 91st Street. Officers Myskowsky and King, who were first to respond by patrol car to the 911 call, picked up the complainant at her apartment building and proceeded to drive her around the neighborhood for 15 to 20 minutes looking for suspects. According to Officer Myskowsky, the complainant described her attackers as "three or four male blacks, teens." No other description was given.

Several other officers responded to the call as well. Officer Mitchell, who was in a separate patrol car, initially canvassed the area with no success, but the search for suspects then focused on a garage with a roll down gate located about one quarter of a block away from where the complainant had been attacked. Officer Myskowsky was directed to bring his car to the garage. Once he observed that the other officers had gained access to the garage on foot, he left and drove the complainant to the precinct on 100th Street, where she was treated by EMS.

Officer Mitchell was one of seven officers who searched the garage, which was located down a flight of stairs. The officers found a purse outside a locked boiler room. The Emergency Services Unit (ESU) of the New York City Police Department was contacted to come break open the locked door. Once inside the boiler room, the officers found defendant Dimitri Marshall lying on the floor. A plastic bank or credit card belonging to the complainant was located near him and to his left was a gun. Defendants Thomas Cruz and Kareem Santiago were found inside an opening or well in the floor of the boiler room. The well, which was covered by a grate, was described as being dirty and sooty when opened. A plastic bag containing one eighth of an ounce of crack cocaine was recovered from that area. Following a physical struggle between the officers and defendants, defendants were arrested and placed in handcuffs.

Approximately 15 minutes after he returned to the precinct, Officer Myskowsky was instructed to drive the complainant back to the garage for a showup identification. They arrived at the garage shortly after defendants had been arrested and approximately one hour after the 911 telephone call had been placed. During their ride from the precinct to the garage, Officer Myskowsky explained to the complainant "that [there are] people stopped in the garage" and told her that "she was to look at them and let me know if [she's] seen them before."

Officer Myskowsky drove into the garage where he encountered a "large group of people" inside. The group included de-

fendants who were standing side by side, just outside the boiler room. Although no handcuffs were readily visible, each defendant had his hands behind his back and Officer Myskowsky stated he assumed they were handcuffed "because they had their hands behind their backs in that position." Officer Mitchell was physically holding onto Santiago, who had sustained a laceration to his face during his struggle with police. Other than the complainant, defendants were the only civilians present. Two uniformed officers stood to the right of defendants and two other uniformed officers stood on their left side. Another three or four uniformed officers stood behind them. Including ESU, there may have been eight or more officers in the garage surrounding defendants. All three defendants, particularly Cruz and Santiago, were visibly dirty and, as Officer Mitchell described it, covered with soot from head to toe, including their faces. No effort was made to clean up defendants before they were shown to the complainant.

When Officer Myskowsky drove his patrol car into the garage, he already had his headlights on. He then turned on the takedown lights mounted on the hood of his car, pointing them directly ahead in the direction of the defendants. The garage was well lit, even without the patrol car lights. As Officer Myskowsky described it, the overhead lighting was "pretty good" and "it wasn't dark before the car came in." He stopped his vehicle approximately 20 to 30 feet away from the group and got out of the patrol car, leaving the complainant seated in the rear. Officer Myskowsky then positioned himself to speak with the complainant and asked her to look at the individuals. Although there was a mesh divider between the back and front seats of the car, and the complainant looked at the individuals through the front windshield, Officer Myskowsky testified, without contradiction, that the complainant had a clear view of the individuals she was asked to identify. After looking at the three men, she identified them as the men who had robbed her, but according to Officer Myskowsky, the complainant also stated that they looked different than when they had attacked her because they were "dirty."

Officer Mitchell, who testified that he pulled Santiago out of the well and was holding onto him, stated that when Santiago was shown to the complainant, he was covered with soot and had a laceration on his nose. The officer could not tell if the cut was bleeding, because "he was still covered in it," an apparent reference to the soot. Despite his appearance, Officer Mitchell

stated that no effort was made to clean up Santiago's face. When asked at the *Wade* hearing whether it was reasonable to say that Santiago's face was much darker in the garage than it appeared "right now" (in court), Officer Mitchell responded "it was a little darker, yes." Santiago is not black, but a light-skinned Hispanic. None of the defendants were teenagers at the time of the crime.

The Court of Appeals has repeatedly held that showup identifications are strongly disfavored because they are suggestive by their very nature (*People v Ortiz*, 90 NY2d 533 [1997]; *People v Johnson*, 81 NY2d 828 [1993]; *People v Riley*, 70 NY2d 523 [1987]). However, they are not presumptively infirm and are permissible where exigent circumstances exist requiring immediate identification (*see People v Rivera*, 22 NY2d 453, 455 [1968], *cert denied* 395 US 964 [1969]) or if the suspects are captured at or near the crime scene and can be viewed immediately (*see Riley* at 529).

Examples of exigency include the police needing to know whether they have apprehended the right person or whether they should keep looking for other suspects, or when the victim has been mortally wounded and is not expected to survive his or her injuries to later identify his or her attacker (*see People v Howard*, 22 NY3d 388, 402 [2013]). Even in the absence of exigent circumstances, a showup identification may still be permissible if it took place at or near the scene of the crime, shortly after it was committed and in the context of a continuous, ongoing investigation (*People v Brisco*, 99 NY2d 596, 597 [2003]).

Although prompt showup identifications which are conducted in close geographic and temporal proximity are not presumptively infirm, they are not routinely admissible either (*see Ortiz* at 537), but must be examined further to see whether they are part of an unbroken chain of events, or ongoing investigation (*People v Duuvon*, 77 NY2d 541, 543-545 [1991]). "Promptness" varies from case to case (*see Howard* at 402; *Duuvon* at 544). Even when a showup identification satisfies the temporal and geographic proximity requirements, it cannot be unduly suggestive (*id* at 543).

The burden is initially on the People to produce evidence validating the admission of such evidence (*Ortiz* at 537). A defendant challenging a showup identification, however, bears the ultimate burden of proving that the procedure employed by law enforcement was unduly suggestive and the identification

should be suppressed (*id.*). Whether a showup is unduly suggestive under the circumstances usually presents a mixed question of law and fact, and the trial court is entitled to deference (*Howard* at 403). There are circumstances, however, when a showup identification is unduly suggestive as a matter of law, requiring its suppression (*Johnson* at 831).

■ The People argue they have met, and in fact exceeded, their initial burden of showing that all the components of a permissible showup were satisfied, including the requirements of temporal and geographical proximity, exigency and reasonableness. We disagree. Although the complainant's identification of defendants was made in close geographic and temporal proximity to the crime, this was not a situation where the showup was unavoidable because of a fast-paced situation (*see Rivera* at 455). The complainant had already been driven away from the scene to the precinct, where she was being tended to by EMS for her injuries. Her treatment was interrupted so that she could return to the garage, one hour after the crime, to identify the suspects who were already under arrest (*see Brisco* at 597; *Johnson* at 831).

Nor were there exigent circumstances warranting a showup identification. The 55-year-old complainant, though bruised and visibly shaken, was not suffering from any life threatening wounds that would have made her otherwise unable or unavailable to make an identification at a later time or at the precinct where she was already located (*see Rivera* at 455). Furthermore, after Officer Myskowsky ascertained that other officers had suspects confined to the garage, he left the scene because, as he testified, "there was no point guarding the gate of somebody [sic] trying to get away." Thus, having determined that there were suspects detained in a confined area where they could not escape, the police stopped canvassing the area (*see Duuvon*; *Riley*) and public safety was no longer an issue (*see Howard* at 403).

We disagree with the dissent's conclusion that exigent circumstances existed because without a showup identification, the police could not have detained the defendants. By the time the defendants were shown to the complainant they were already cuffed and arrested. Moreover, there was sufficient probable cause to arrest them for the assault and other crimes without conducting a showup identification.

Although the dissent takes into consideration the People's argument that the burden of arranging a lineup at the precinct,

particularly given the late hour, is an additional factor lending exigency to the situation, the additional time and resources required to conduct a separate lineup for each defendant are nothing more than the administrative burdens generally attendant to conducting lineup identifications. Inconvenience does not excuse the utilization of the preferable method of lineup identification (*see Riley* at 530 [undue burden not established by renovation of station house or effort to minimize time defendant was detained]).

In any event, the showup identifications in this case were unduly suggestive. While suggestiveness is inherent and tolerated in all showup identifications, that does not mean that such law enforcement procedures are without limitations. The cumulative techniques the police employed in the showup identification before us renders it unduly suggestive.

Here, the three suspects were standing side by side after the complainant had described her attack by multiple attackers. Defendants were flanked by as many as eight officers and, apart from the complainant, they were the only civilians present. Defendants were visibly restrained. This was obvious, not only from the fact that their hands were behind their backs, but also from the fact that defendant Santiago, who had visible physical injuries to his face indicative of a recent scuffle, was being physically restrained by one of the officers as the complainant made her identification. Defendants were covered in soot, such that it affected their appearance, particularly as to skin color. Previously, the complainant had described her assailants' "black" skin color as a prominent identifying feature, along with their ages. As the complainant was driven from the precinct to the location of the showup identification, she was told that she would be looking at people, and that she should tell the officers if she had seen them before. When defendants were shown to the complainant, they were illuminated by the patrol car's headlights and takedown floodlights, even though the garage lighting itself was good.

We recognize that some of these factors, either alone or even in combination do not necessarily make a showup identification unduly suggestive. A showup identification may be acceptable, even where a defendant is handcuffed and guarded by police officers when shown to the complainant (*Duuvon* at 545). Nor is the fact that remarks are made to a complainant before being taken to a lineup itself a basis for a prohibited showup identification (*People v Gatling*, 38 AD3d 239, 240 [1st Dept

2007], *lv denied* 9 NY3d 865 [2007]). This is because a person of ordinary intelligence would realize that the police are showing them someone suspected of having committed a crime (*see People v Santiago*, 83 AD3d 1471 [4th Dept 2011], *lv denied* 17 NY3d 800 [2011]). Even shining lights on a suspect is not by itself unduly suggestive (*People v Gilford*, 16 NY3d 864 [2011]). It is the cumulative effect of what otherwise might be individually permissible that makes this particular showup identification unduly suggestive. The showup was clearly beyond the high-water mark set forth by the Court of Appeals in *Duuvon*.

In *Duuvon*, the Court of Appeals held that although a showup identification in which the defendant was shown while handcuffed in the backseat of a patrol car was suggestive, it was not unduly so, given the fast-paced events which transpired in rapid succession within three to four minutes after the commission of the crime making misidentification unlikely. The Court cautioned, however, that the manner in which the defendant was shown "is suggestive and not preferred. It presses judicial tolerance to its limits" (*id.* at 545). At bar, the circumstances of the showup identification were much more suggestive, surpassing the limits of judicial tolerance set in *Duuvon*.

Contrary to the dissent, there is no binding precedent mandating a different conclusion from the one we reach in this case. There is no case in which so many suggestive practices and procedures simultaneously converged, but were found acceptable by this, or any other, appellate court. In fact, the binding precedent is quite the contrary. As the Court of Appeals has held: "Generally, a showup identification will be inadmissible when there was no effort to make the least provision for a reliable identification and the combined result of the procedures employed establish that the showup was unduly suggestive" (*Riley* at 529, citing *People v Adams*, 53 NY2d 241, 249 [1981] [internal quotation marks omitted]).

Having failed to show that the showup identification was reasonable, the People nonetheless maintain that the complainant sufficiently described her attackers to the police before the showup. Since the reliability of the complainant's identification is at issue, and the Supreme Court, by finding the showup was not unduly suggestive did not conduct an independent source hearing, we reverse and vacate the robbery and stolen property convictions of all three defendants, remand for a pretrial independent source hearing, and a new trial on the robbery and criminal possession of stolen property counts (*People v Wilson*,

5 NY3d 778 [2005]; *People v Foster*, 200 AD2d 196, 200-201 [1st Dept 1994]).

The issue of the undue suggestiveness of the showup identification was raised by all three defendants below. While Santiago only indirectly raised that issue on appeal, it was directly raised by both his codefendants. Since we find the showup identification was unduly suggestive and it was necessarily defective as to all three defendants, we reach that issue as to Santiago in the interest of justice.

█ We find, however, that the trial court properly exercised its discretion under CPL 200.70 when it amended a count of the indictment by changing the description of the stolen property from "credit card" to "debit card" (*see People v Grist*, 98 AD3d 1061, 1062 [2d Dept 2012], *lv denied* 20 NY3d 1061 [2013]). Penal Law § 165.45 (2) states that a person is guilty of criminal possession of stolen property in the fourth degree "when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof" and "[t]he property consists of a credit card, debit card or public benefit card." While there are some differences between a credit card and a debit card, the language of the statute encompasses both, the elements of the crime are the same, and the amendment of the indictment was within the category of amendments relating to "matters of form . . . and the like" contemplated by CPL 200.70 (1). It did not improperly change the prosecution's theory of the case, nor have any of the defendants explained how their defense was impacted.

Marshall's arguments concerning the sufficiency and weight of the evidence on the weapons possession charge are likewise unavailing (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]).

Accordingly, the judgment of the Supreme Court, New York County (Michael J. Obus, J., at hearing; Marcy L. Kahn, J., at jury trial and sentencing), rendered December 3, 2010, as amended January 7, 2011, convicting defendant Thomas Cruz of robbery in the second degree (two counts), criminal possession of a controlled substance in the fourth degree, criminal possession of stolen property in the fourth degree and resisting arrest, and sentencing him to an aggregate term of six years should be modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and the count of criminal possession of stolen

property in the fourth degree, remand for an independent source hearing and retrial, and otherwise affirmed. Judgment, same court and Justices, rendered February 1, 2011, as amended February 15, 2011, convicting defendant Kareem Santiago of robbery in the second degree (two counts), criminal possession of stolen property in the fourth degree and resisting arrest, and sentencing him to an aggregate term of 4½ years, should be modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and on the criminal possession of stolen property in the fourth degree count, remand for an independent source hearing and retrial, and otherwise affirmed. Judgment, same court and Justices, rendered December 3, 2010, as amended December 15, 2010, convicting defendant Dimitri Marshall of robbery in the second degree (two counts), criminal possession of stolen property in the fourth degree, criminal possession of a weapon in the fourth degree and resisting arrest, and sentencing him, as a second violent felony offender, to an aggregate term of 8½ years, should be modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and on the criminal possession of stolen property in the fourth degree count, remand for an independent source hearing and retrial, and otherwise affirmed.

Tom, J. (dissenting). Defendants appeal from convictions arising out of a robbery of a female victim. Their primary contention is that a showup identification, made approximately one hour after the commission of the crime, was unduly suggestive and should not have been admitted into evidence. They further argue that the verdict is against the weight of the evidence and that the trial court erred in constructively amending the indictment. The issues raised by defendants are without merit.

In the early morning hours of February 5, 2010, the victim was returning home from work as a nurse's aide. She exited the subway on West 86th Street and was walking along 90th Street between Columbus and Amsterdam Avenues in Manhattan, when she noticed defendant Dimitri Marshall just a few feet away from her, running towards her with two figures silhouetted behind him. She was carrying a large blue bag containing a book, cell phone, charger, keys, cigarettes and an expired, prepaid MasterCard. Marshall grabbed her left arm and began punching her in the face, knocking her to the

ground. She attempted to get up, but Marshall and defendant Thomas Cruz knocked her down and kicked her. She saw defendant Kareem Santiago standing with them, but he took no part in beating her. The location of the area of the attack was well lit by streetlights and lights from a nearby parking lot, and the victim was able to observe her assailants. She described Marshall as a dark-skinned African-American man with a wide face and Santiago as tall and skinny with a "narrow face." She stated that Cruz wore a gray or partially gray jacket, and she was able to see his face. As a result of the attack, the victim's jawbone was displaced and swollen, and she had pain in her left shoulder, knee and leg.

While Marshall took the bag and ran toward Columbus Avenue, the victim stood up and saw that Cruz and Santiago were still standing nearby. She ran toward Amsterdam Avenue and did not see where the two men went. She arrived at her apartment in about four minutes, where a neighbor called the police. Two officers responding to a radio call arrived within minutes. They placed the victim in their car and drove her around the neighborhood in search of her attackers. Lieutenant Seamus Lavin and another officer were also in the vicinity in a patrol car and responded to the radio call. Upon getting out of their car, they saw three men descending the stairway to the public entrance of a garage approximately a quarter of a block from the crime scene. They were only able to see the back of the men's heads but observed that one wore a baseball cap. They heard one of the men say, "Oh shit. The cops," as another marked police car approached, and then observed the men immediately going down the staircase to the garage, which had two entrances. Lieutenant Lavin immediately secured both entrances. He directed Officers Christopher Mitchell and Laquidara to drive their patrol car to the 90th Street entrance to prevent anyone from entering or leaving while Lavin and other officers entered the 91st Street entrance to search the garage. Officer Mitchell later left his patrol car to assist other officers in the search.

Officers Mitchell and Myskowsky testified at the suppression hearing. Officer Mitchell testified that the victim's blue bag was found outside a locked door of a room in the garage. An emergency services unit (ESU) was called and pried open the door, which led to a 6-foot by 10-foot maintenance room. The three suspects were found hiding in the small room. Two were found in a hole in the floor, and were covered in soot. Officer

Mitchell testified that among items found in the maintenance room with defendants were the victim's wallet, cell phone, cell phone charger and ATM card. Defendant Santiago resisted arrest when he was pulled out of the hole in the room. Once the suspects were secured, the victim was brought to the garage by Officer Myskowsky within "a couple of minutes" to make an identification. Officer Mitchell stated that the lighting at the scene was provided by both the garage ceiling lights as well as the headlights and "take down lights" of a police car. Once the victim was brought to the scene, she identified all three suspects as the individuals who had robbed her.

Officer Myskowsky, who responded to the victim's 911 call, was told by the victim of the vicious attack and robbery by three young men. He testified that he later drove the victim to the garage to make an identification of the defendants. She was driven back to the garage where, she was told, she was to view some people who had been stopped and to let the police know if she had ever seen them. Defendants were standing outside the maintenance room, with their hands behind them and with two uniformed officers standing to their right, two to their left, and two or three other officers standing behind them. Though the victim remarked to Officer Myskowsky that defendants looked different because they were dirty, she identified all three as her assailants. Officer Myskowsky further testified that approximately one hour elapsed from the time the police had received the 911 call to the victim's identification of the defendants as her assailants.

Defendants' motions to suppress identification testimony were properly denied. The showup procedure utilized by police was justified in the interest of prompt identification (*see People v Duuvon*, 77 NY2d 541 [1991]; *People v Love*, 57 NY2d 1023, 1024 [1982]) and conducted within approximately one hour of the crime despite delay occasioned by defendants, who locked themselves inside the maintenance room of the garage and resisted arrest (*see People v Brisco*, 99 NY2d 596 [2003]). The alternative lineup procedure would have been time-consuming, allowing the victim's memory to fade while the police processed the defendants and tried to locate three sets of suitable fillers to participate (*see People v Parker*, 50 AD3d 603 [1st Dept 2008], *lv denied* 11 NY3d 740 [2008]). Contrary to the majority's contention, no facts presented at trial are being relied on to substantiate the showup identification. Rather, much of the testimony given at the suppression hearing and trial overlapped.

As an initial consideration, at the suppression hearing both Marshall and Cruz complained generally that the identification procedure was unduly suggestive. However, the particular grounds now advanced by Cruz as improper—the use of a police car's takedown lights to illuminate the suspects and the insufficiency of the victim's opportunity to view her attackers—were not raised before the suppression court and are unpreserved for appellate review (*see e.g. People v Williams*, 99 AD3d 495 [1st Dept 2012], *lv denied* 20 NY3d 1066 [2013]). The enhanced illumination would have only assisted the victim in clearly viewing the suspects and making an accurate identification, foreclosing objection that the lighting was inadequate for that purpose (*see People v Maynard*, 40 AD2d 779, 780-781 [1st Dept 1972, Murphy, J., dissenting]).

While Marshall further complained that resort to the identification procedure was unwarranted due to the lack of exigent circumstances, it is settled that a showup is nevertheless permissible as long as it is conducted within reasonable geographic and temporal proximity to the crime (*see e.g. Brisco*, 99 NY2d at 597). Defendants were identified at the location of their arrest and approximately one quarter of a block from the crime scene. The majority's argument that this was not a "fast-paced situation" to justify a showup identification is without substance. The police were already canvassing the area approximately four minutes after the robbery. A very short time thereafter, defendants were cornered inside a locked room of the garage. The police acted as promptly as they could and, in fact, any delay in the identification by the victim was caused by defendants. Notably, locking themselves in a maintenance room and refusing to open the door required responding officers to arrange for an emergency services unit to arrive at the scene and wait until a forcible entry could be effected. Defendants then resisted efforts to take them into custody. Once they were secured, the victim was promptly brought to the scene to make an identification. Any alleged lack of promptness in conducting the identification is entirely attributable to defendants. The showup identification, which took place approximately one hour after the commission of the robbery and in the context of an immediate and continuous investigation, cannot be said to have been unreasonable under the circumstances (*id.* at 597 [upholding identification made within an hour in the course of a continuous, ongoing investigation]; *People v Howard*, 22 NY3d 388 [2013] [identification made two hours

after crime]; *see also People v Cannon*, 306 AD2d 130 [1st Dept 2003]). Thus, the People fulfilled their obligation to produce evidence validating the admission of the victim's identification of her assailants (*People v Ortiz*, 90 NY2d 533, 537 [1997]).

The conditions asserted by defendants and by the majority to have been unduly suggestive are merely those that are generally unavoidable in view of reasonable security concerns inherent in any showup, to wit, "the likelihood that an identifying witness will realize that the police are displaying a person they suspect of committing the crime, rather than a person selected at random" (*People v Gatling*, 38 AD3d 239, 240 [1st Dept 2007], *lv denied* 9 NY3d 865 [2007]). Given the violence of the crime and the struggle with police to avoid being handcuffed and arrested, the presence of multiple police officers in the vicinity of the three suspects was an appropriate and necessary security measure (*see People v Brujan*, 104 AD3d 481 [1st Dept 2013], *lv denied* 21 NY3d 1014 [2013]; *People v Sanchez*, 66 AD3d 420 [1st Dept 2009], *lv denied* 13 NY3d 862 [2009]). In addition, it is conceded that at least two ESU officers were still on the scene. On remarkably similar facts, this Court held that viewing a defendant with his hands cuffed behind him, surrounded by police officers with an officer holding his arm in the vicinity of a number of marked patrol cars and illuminated with an "alley light," does not render the circumstances unduly suggestive (*People v McNeil*, 39 AD3d 206, 209 [1st Dept 2007]), and we are obliged to abide by established precedent (*Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 388 [1983, Wachtler, J., dissenting]; *Matter of Eckart*, 39 NY2d 493, 498-499 [1976]; *Matter of Terrace Ct., LLC v New York State Div. of Hous. & Community Renewal*, 79 AD3d 630, 642 [1st Dept 2010, Nardelli, J., dissenting], *affd* 18 NY3d 446 [2012] ["it is the role of this Court to follow its precedents"]). Further, defendants had their hands behind their backs and thus, their handcuffs were not visible to the victim.

The judicial policy of accepting showup identifications is founded upon the "objective that the police have reasonable assurances that they have arrested or detained the right person" (*Duuvon*, 77 NY2d at 545), and it is clear that this policy was promoted on the facts at bar. Here, within a very short time after the robbery, the police cornered the perpetrators locked inside a maintenance room of a garage, less than a block from the crime scene. The victim's bag was located outside the locked door, and the incriminating evidence consisting of the victim's

stolen personal property was found inside the small room with defendants. Simply, defendants were apprehended within close geographic and temporal proximity to the crime in possession of the stolen goods. Under the facts of this case, the police clearly had reasonable assurance that they had detained the right suspects (*id.*).

Cruz argues that the victim did not have a long time to view him and that he was dirty when she viewed him. The maintenance room was extremely dusty, and when defendants were pulled from the room they were covered with dust and soot. At the showup, the victim remarked that defendants looked somewhat different because they appeared dirty. However, the victim had an adequate opportunity to view Cruz at the time of the attack, and she recognized him as one of her robbers at the showup, even though she was aware that defendants appeared dirtier than when they had robbed her. The victim also identified defendants at trial. She testified that Marshall was the one who had run up to her initially and punched her, and that Cruz was the one who had kicked her while she was on the ground. She then identified Santiago as the third man and the one who had remained with Cruz while Marshall ran off with her purse.

Moreover, the showup was warranted by exigent circumstances—particularly, to establish that defendants and not some other individuals were the correct suspects and that they were not, as defendant Santiago testified, merely in the wrong place at the wrong time. If, as Santiago claimed, defendants' presence in the garage, locked in a maintenance room, was attributable to smoking marijuana and avoiding apprehension for a drug offense by hiding from the police, a prompt identification was necessary to rule out defendants as suspects in the robbery (*cf. People v Seegars*, 172 AD2d 183 [1991], *appeal dismissed* 78 NY2d 1069 [1991] [victim's identification of suspect precluded further suggestive procedures to obtain identification by other witnesses]).

At trial, testimony elicited from the officers at the scene and Lieutenant Lavin showed that Marshall was found in the maintenance room lying on the ground, his hands beneath his body and his feet on top of a metal plate. A gun was next to him. It was dusty and without either ammunition or a magazine. Marshall struggled, but one of the officers was able to handcuff him and take him out of the room. Removing the metal plate disclosed a hole or sump, some three or four feet deep and two

feet wide, in which Cruz and Santiago were hiding. The two men would not voluntarily climb out of the hole and had to be forcibly removed. During the struggle, Santiago sustained a laceration to his nose and had blood on his face. From the maintenance room in close proximity to defendants, the officers recovered, among other things, a package containing over one eighth of an ounce of crack cocaine, located in the area where Cruz had been hiding.

The convictions are supported by sufficient evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). The sequence of events, both during and after the robbery, demonstrates Santiago's accomplice liability for the robbery, supporting a reasonable inference that he participated by "placing himself where he could intimidate the victim and be ready to render immediate assistance" to his companions (*Matter of Fabian J.*, 103 AD3d 564, 565 [1st Dept 2013]). We have considered and rejected Santiago's and Marshall's challenges to the evidence supporting the possessory charges.

The court properly exercised its discretion under CPL 200.70 in amending a count of the indictment to change the description of the stolen property from "credit card" to "debit card" (*see People v Grist*, 98 AD3d 1061, 1062 [2d Dept 2012], *lv denied* 20 NY3d 1061 [2013]). While there are differences between the two, the change in nomenclature is within the category of amendments relating to "matters of form . . . and the like" contemplated by CPL 200.70 (1), and the amendment did not improperly change the prosecution's theory of the case.

Accordingly, the judgments should be affirmed.

RENWICK and KAPNICK, JJ., concur with GISCHE, J.; TOM, J., dissents in a separate opinion in which GONZALEZ, P.J., concurs.

Judgment, Supreme Court, New York County, rendered December 3, 2010, as amended January 7, 2011, modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and the count of criminal possession of stolen property in the fourth degree, and remand for an independent source hearing and retrial, and otherwise affirmed. Judgment, same court, rendered February 1, 2011, as amended February 15, 2011, modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and on the criminal possession of stolen property in the fourth degree count, and remand for an independent source hearing and retrial, and otherwise affirmed. Judgment, same court, rendered December

3, 2010, as amended December 15, 2010, modified, on the law and the facts, to vacate the judgments of conviction on the two counts of robbery in the second degree and on the criminal possession of stolen property in the fourth degree count, and remand for an independent source hearing and retrial, and otherwise affirmed.