■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAFAEL PEREZ, Appellant. [37 NYS3d 243]—

Judgment, Supreme Court, Bronx County (Megan Tallmer, J.), rendered November 29, 2006, convicting defendant, after a jury trial, of robbery in the first degree and violation of probation, and sentencing him, on the robbery conviction, as a second felony offender, to a term of 15 years, and on the violation of probation, to a concurrent term of five years, affirmed. Judgment, Supreme Court, Bronx County (John N. Byrne, J.), rendered March 7, 2005, convicting defendant, upon his plea of guilty, of assault in the second degree, and sentencing him to a term of six months, concurrent with five years' probation, modified, on the law, to the extent of vacating the sentence and remanding for a youthful offender determination, and otherwise affirmed.

Defendant was apprehended by police officers who were investigating a pattern of robberies inside a New York City Housing Authority (NYCHA) building by performing a "vertical patrol." The police had made prior arrests for narcotics and trespass at the building, and considered it a high-crime area. The officers were in plain clothes, with their shields displayed around their necks. As part of the investigation, the officers were knocking on residents' doors and conducting interviews.

While the officers were on the seventh floor, the elevator door opened. Several individuals exited the elevator, followed by defendant, who was wearing a black T-shirt over a yellowish-tan hooded sweatshirt with the hood up. Defendant took one step out of the elevator, but, apparently upon noticing the officers, went back into the elevator. When one of the officers said to him, "Can you hold the door, police, hold the door," defendant "kept pressing" the elevator button to close the door. The door closed and the elevator went up. According to the officer, defendant's behavior, coupled with the fact that the building entertained heavy narcotics traffic, motivated him and his colleagues to go up the stairs to verify that defendant belonged in the building. When the elevator did not stop on the eighth floor, the officers walked to the ninth floor and saw defendant in the hallway. One of the officers approached defendant, again identified himself as a police officer, and asked him if he lived in the building. Defendant did not respond, and turned and faced the wall with his head down and his hood up. Upon ap-

proaching defendant, the officer observed a bulge in the sleeve covering defendant's right arm, which defendant was holding stiffly "straight down" from his body with his hands hidden under his sleeves. He again asked defendant if he lived in the building, and again defendant did not respond. The officer then asked defendant if he had any weapons, and, when defendant remained silent, he directed him to show his hands. When defendant refused to comply, the officer repeated his direction "several times," but defendant would not cooperate. Concerned for his safety, the officer grabbed defendant's wrist area, where he felt a metal object. He then raised defendant's arm, pulled back his sweater, and observed the silver tip of a machete. Defendant was ordered to drop the machete, and again refused to comply. The officers removed the two-foot machete from his sleeve. Defendant was arrested, and $175 was recovered from him.

Around the same time, a police sergeant received a radio transmission describing a robbery that had occurred earlier that evening near the building where defendant had been arrested. The sergeant was informed that the complainant reported that he was robbed at the point of a machete by two males, one with a red jacket and the other with a black shirt over a yellow mustard hooded sweatshirt. While canvassing for suspects, the sergeant received a phone call from the officer who had arrested defendant in which the officer reported the arrest and defendant's possession of a machete. Upon hearing the description of defendant's clothing, which matched the description of the robbery suspect, the sergeant instructed the arresting officer to hold defendant at the scene until he arrived. He then picked up the complainant and transported him to outside the building where defendant had been arrested and was being held in the lobby. From within a police vehicle, and not having been informed that a machete was recovered or told that the person he would view matched the description he gave to police, the complainant, upon seeing the handcuffed defendant through the window of the building lobby, immediately identified defendant as the person who had robbed him.

Defendant, still handcuffed, was then placed in a police van and met by another officer, who asked him how he was doing. Defendant replied by saying that he knew he was "going up north" and that he would "tell you what you want" if he was given a sandwich. The officer transported defendant to the precinct, placed him in the debriefing room, and instructed two officers to get defendant a sandwich. When they returned with the sandwich 15 to 20 minutes later, the officer gave it to de-

fendant. Immediately, defendant stated that "[t]he other guy [you are] looking for" was in his apartment. The officer never questioned defendant and did not advise him of his *Miranda* rights.

Supreme Court denied defendant's motion to suppress. With regard to the stop and search of defendant, the court found that "all of the police actions were justified from their inception." The court concluded that defendant caused the officers to become suspicious when he stepped back into the elevator after observing them with their shields displayed and failed to comply with the direction to hold the elevator door. This, the court held, gave the officers the necessary predicate to follow defendant to the ninth floor and ask him if he lived in the building. The court further concluded that the arresting officer had a legitimate concern for his safety and a credible reason to believe defendant had a weapon, based on defendant's refusal to answer his questions, the manner in which he was holding his arm, and the bulge under his sleeve. The court found that once defendant refused to comply with the officer's direction to show his hands, the officer was justified in taking the added step of pulling back defendant's sleeve, which revealed the presence of the machete.

The court ruled that the showup was not suggestive because the sergeant who brought the complainant to the building where defendant was arrested did not reveal to the complainant that defendant possessed a machete and that defendant matched the complainant's description of his assailant to police. It noted that the complainant's immediate identification of defendant, without any prompting, indicated that the identification was not tainted by suggestiveness and was not the fruit of any unlawful police conduct. Regarding defendant's statements, the court held that while the People conceded custody, defendant was not interrogated and that his statements were completely spontaneous.

Defendant argues on appeal that his arrest was wrongful because the entire series of events that precipitated it was based on a misperception of behavior that was not inherently suspicious and that was consistent with his right to be left alone. The People maintain that the police officers had the right to question defendant based on his mere presence in the building, since it was a NYCHA building that was rife with trespassing and other illegal activity. In any event, the People contend that defendant's retreat into the elevator was sufficient to, at the very least, trigger their right to inquire, and that the actions by defendant that followed justified the offi-

cers' decisions to grab his arm and arrest him after discovering the machete.

In determining whether a police encounter with a member of the public is justified, we must consider all of the attendant circumstances (*see People v Benjamin*, 51 NY2d 267, 271 [1980]; *People v Stephens*, 47 AD3d 586, 588-589 [1st Dept 2008], *lv denied* 10 NY3d 940 [2008]). Here, one such circumstance was the fact that the building was owned by NYCHA and that the officers had a duty to keep it free of trespassers (*see People v Williams*, 16 AD3d 151 [1st Dept 2005], *lv denied* 5 NY3d 771 [2005]). It is unclear from *People v Barksdale* (26 NY3d 139 [2015]), recently decided by the Court of Appeals, whether defendant's mere presence in the building gave rise to a level one inquiry under *People v De Bour* (40 NY2d 210 [1976]), since *Barksdale* specifically dealt with a private building registered in the trespass affidavit program. However, the officers did not testify that defendant's mere presence in the building caused them to suspect that he did not belong there; rather, it was that fact combined with his effort to prevent them from getting into the elevator with him. Even if the officers did not have an objective credible reason to question defendant based only on *Barksdale*, the building's trespass history, together with defendant's apparently panicked attempt to avoid contact with them upon their attempt to enter the elevator, gave the officers the right to inquire of defendant.

It is not insignificant that defendant actively evaded the officers' efforts to get into the elevator with him. Indeed, that is what distinguishes this case from *People v Johnson* (109 AD3d 449 [1st Dept 2013], *appeal dismissed* 23 NY3d 1001 [2014]). In *Johnson*, this Court reversed the denial of suppression of a gun recovered from the defendant. The sole predicate for the initial encounter there was, according to the officers in that case, the reputation of the building as "drug-prone" and the defendant's action of, while descending a staircase immediately upon seeing the officers in the lobby, freezing and jerking back (109 AD3d at 449). Notably, the defendant in *Johnson* did not attempt to retreat from the officers (*id.*). Here, to the contrary, defendant not only retreated back into the elevator after initially stepping out of it, but also tried to bar the officers from following him into the elevator.

Further, in *Johnson*, there was no mention of a history of trespass in the building, whereas the officer who initially encountered defendant testified that he had made trespass arrests before in the subject building. While, again, the building may not have been a trespass affidavit building like the build-

ing in *Barksdale* (which, notably, was decided after *Johnson*), it is at the very least relevant that the officers were on alert for people who did not belong in the building (*see People v Holmes*, 81 NY2d 1056, 1058 [1993] ["Flight, combined with other specific circumstances indicating that the suspect may be engaged in criminal activity, could provide the predicate necessary to justify pursuit"]). Similarly distinguishable is *Matter of Michael F.* (84 AD3d 468 [1st Dept 2011]), on which defendant relies, since the stop in that case did not take place in a building with a history of trespassers. Considering, again as we must, the totality of the circumstances (*see People v Benjamin*, 51 NY2d at 271), we find that the police had an objective, credible reason under *De Bour* to follow defendant to the ninth floor and ask him if he lived in the building.

The police action that followed was also proper. Defendant's refusal to respond to the officer's repeated inquiries, first into whether he lived in the building and next whether he was armed, and the direction to show his hands, was, while perhaps not determinative, still a significant factor escalating the encounter beyond the level one intrusion warranted by the earlier behavior (*see People v Fabian*, 56 AD3d 334 [1st Dept 2008], *lv denied* 12 NY3d 783 [2009]). Moreover, the officer testified that he was concerned for his safety, which was justifiable based on the bulge he observed in defendant's sleeve, the awkward manner in which he was holding his arm, and his recalcitrance upon being asked if he had a weapon and directed to display his hands (*see People v Chin*, 192 AD3d 413 [1st Dept 1993], *lv denied* 81 NY2d 1071 [1993]). The situation encountered by the police in this case differs significantly from cases cited by defendant, such as *People v Crawford* (89 AD3d 422 [1st Dept 2011]) and *People v Powell* (246 AD2d 366 [1st Dept 1998], *appeal dismissed* 92 NY2d 886 [1998]), insofar as those cases involved defendants whom the police initially stopped having no reason to believe that criminal activity was afoot and whom the police searched with no justification for thinking that the defendant was carrying a weapon. Considering the totality of the circumstances, we reject defendant's challenge to the specific manner in which the officer searched him for the presence of a weapon.

We take a broader view than the dissent, one authorized by *People v De Bour*, which recognized "that police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds" (40 NY2d at

225). Here, defendant's active escape from the presence of the police, coupled with his utter refusal to face the officers or answer their questions, including whether he was armed, created a situation that was "fraught with tension" (*id.* at 226) and thus justified the police intrusion. Our view is also more broad than the dissent's with respect to whether the officers were authorized in searching defendant for a weapon. The dissent takes too narrow a view when it focuses only on the officers' inability to definitively ascribe the bulge in defendant's sleeve to the presence of a weapon. The focus should be on all of the attendant circumstances, including the manner in which defendant was holding his arm and his refusal to state whether he was armed or to show his hands when asked.

The showup, in close geographic and temporal proximity to the robbery, was appropriate and was not rendered unduly suggestive by the fact that defendant was handcuffed and flanked by officers (*see People v Gilford*, 16 NY3d 864, 868 [2011]; *People v Gatling*, 38 AD3d 239 [1st Dept 2007], *lv denied* 9 NY3d 865 [2007]). Further, the record supports the court's determination that defendant's statements were spontaneous and not the product of interrogation (*see People v Lynes*, 49 NY2d 286 [1980]). The objections to the prosecutor's remarks fell within the broad leeway afforded prosecutors to address defense arguments on summation (*see People v Galloway*, 54 NY2d 396 [1981]). In any event, any error was harmless in light of the overwhelming evidence of guilt (*see People v Crimmins*, 36 NY2d 230 [1975]).

The People concede, as they must, that defendant is entitled to vacatur of his sentence for the earlier assault conviction and to a resentencing that considers whether he qualifies for youthful offender status (*People v Rudolph*, 21 NY3d 497 [2013]). Nevertheless, defendant is not entitled to vacatur of the sentence for the robbery conviction. It is true that, for a prior conviction to serve as a predicate violent felony conviction, "[s]entence upon such prior conviction must have been imposed before commission of the present felony" (Penal Law § 70.04 [1] [b] [ii]). However, we find that a remand for an adjudication of youthful offender status is, for purposes of determining such sequentiality, analogous to a remand for the imposition of postrelease supervision under *People v Sparber* (10 NY3d 457 [2008]). A *Sparber* resentencing has been held not to upset sequentiality for purposes of determining whether the conviction for which the remand was ordered can serve as a predicate for multiple felony offender status (*see People v Boyer*, 22 NY3d 15 [2013]; *People v Acevedo*, 17 NY3d 297 [2011]). To be sure, a

remand for a youthful offender determination differs somewhat from a *Sparber* remand since the former can result in an actual change to the incarceration element of the sentence whereas as the latter "does not permit the resentencing court to alter the defendant's prison term or otherwise change any aspect of his or her sentence" (*Boyer*, 22 NY3d at 24, citing *People v Lingle*, 16 NY3d 621, 634-635 [2011]). However, as stated in *Boyer*, "Importantly, the rule that the original sentence date controls for purposes of a conviction's qualification as a predicate felony conviction serves the public policy underlying the recidivist sentencing statutes. As we have previously observed, those laws are meant to enhance sentences for defendants who refuse to reform after receiving a valid conviction for a crime and hearing the court pronounce sentence (*see People v Morse*, 62 NY2d 205, 222 [1984]). Under this rationale, a defendant who was sentenced for a prior conviction and then commits a new crime plainly deserves enhanced punishment for the new crime because the defendant remains unchastened after the court's pronouncement of the sentence for the prior conviction, and the defendant's heightened culpability cannot be mitigated in any way by a subsequent *Sparber* resentencing. Under those circumstances, it would make no sense to set the date of sentence for the defendant's prior conviction to the date of the *Sparber* resentencing and thereby prevent the court from enhancing the defendant's sentence for the current crime" (22 NY3d at 26).

We see no reason why the same public policy behind *Boyer* does not apply in the context of remands for youthful offender determinations. Of course, to the extent that, upon remand, the court determines that defendant should receive youthful offender status on the earlier conviction, defendant will be entitled to challenge the sentence on the later conviction by moving pursuant to CPL 440.20.

We have considered and rejected defendant's remaining claims and including those set forth in his pro se supplemental briefs. Concur—Mazzarelli, J.P., Sweeny and Kahn, JJ.

Manzanet-Daniels and Gische, JJ., dissent in a memorandum by Gische, J., as follows: I respectfully dissent, because I believe that from the inception of his encounter with the police, defendant's conduct was consistent with his constitutional right to avoid contact with the police. In addition, the subsequent observation by the police of an otherwise undefined bulge under defendant's sleeve did not furnish the officers with the requisite reasonable suspicion or a basis for believing that the person subjected to the intrusion was armed and potentially danger-

ous. Under these circumstances, the police detention and frisk of defendant by grabbing his wrists, pulling up his sleeves, and removing a weapon from his body was not justified.

In evaluating the propriety of police conduct, the analysis is confined only to the information known to the officers at the time of the encounter (*People v Cruz*, 129 AD3d 119, 121 [1st Dept 2015]; *People v Coles*, 48 AD2d 345, 347 [1st Dept 1975]). Facts that come to light through the subsequent unraveling of events, or that are later established at trial, do not bear upon whether the initial stop was conducted in a constitutionally permissible manner.

The testimony at the suppression hearing revealed that on the evening of October 12, 2005, three police officers were performing vertical patrols inside a NYCHA building in the Castle Hill Housing Development. The officers were dressed in plain clothes, but displayed their shields around their necks. Castle Hill Housing was known to be a high-crime area.

While on the seventh floor, the officers saw the elevator door open and several people exit, followed by defendant, who was wearing a black T-shirt over a mustard-yellow hoodie with the hood covering his head. Defendant took one step out of the elevator, but upon seeing the officers he "went back into the elevator." Officer Rodriguez thereupon asked him, "Can you hold the door, police, hold the door?" According to Officer Rodriguez, defendant "kept pressing the elevator button to close the door." The elevator doors closed, and the cab ascended. Officer Rodriguez testified that because there had been a lot of narcotics traffic in the building, the officers wanted to ascertain whether defendant lived in the building. The officers climbed the stairs and encountered defendant standing in the ninth-floor hallway. When Officer Rodriguez approached defendant, he identified himself as a police officer and asked defendant if he lived in the building. Defendant did not respond, and turned to face the wall with his head down looking towards the ground. Officer Rodriguez again asked defendant if he lived in the building, and again defendant did not answer. Officer Rodriguez then noticed a bulge underneath the sleeve of defendant's right arm. Defendant's hands were hidden inside the sleeves of his sweatshirt, and he was holding them stiffly and in a "straight down" position. When Officer Rodriguez asked defendant if he had any weapons, defendant did not respond. Officer Rodriguez instructed defendant to show him his hands, and repeated the request several times. With defendant continuing to ignore his requests, Officer Rodriguez testified that he became concerned for his safety, causing him to grab defendant's wrist, at which

point he felt a metal blade. Officer Rodriguez then rolled up defendant's sleeve and observed the silver tip of a machete, and ordered defendant to drop it. When defendant did not do as directed, Officer Rodriguez physically removed a machete from inside defendant's sleeve. Defendant was then placed under arrest.

Only after defendant was apprehended did Officer Rodriguez learn, through a phone call to Sergeant Charles Hyland, that a robbery had been reported as having occurred earlier in the day, within close proximity to the Castle Hill Houses. The report indicated that the complainant had been robbed by two males, one wearing a red jacket and the other wearing a black shirt over a mustard-yellow hoodie sweatshirt and wielding a machete. Sergeant Hyland, upon learning from Officer Rodriguez that defendant matched the description of the assailant, directed that defendant be held at the scene. The complainant was then brought to the scene, and defendant was identified as one of his assailants.

"The touchstone of any analysis of a governmental invasion of a citizen's person under the Fourth Amendment and the constitutional analogue of New York State is reasonableness" (*People v Batista*, 88 NY2d 650, 653 [1996] [internal quotation marks omitted]). Whether governmental action is reasonable will turn on the facts of each case and requires consideration of whether the police action at issue "was justified in its inception and whether . . . it was reasonably related in scope to the circumstances which created the encounter" (*People v Powell*, 246 AD2d 366, 368 [1st Dept 1998], *appeal dismissed* 92 NY2d 886 [1998]). The lawfulness of police-initiated encounters with private citizens is governed by the graduated four-level test first outlined in *People v De Bour* (40 NY2d 210, 223 [1976]; *see also People v Hollman*, 79 NY2d 181 [1992]). The degree of restraint on an individual's freedom of movement must correlate with the necessary level of suspicion to warrant the intrusion. Under level one, a police officer may request information from a person provided that the request is supported by an objectively credible reason that need not be necessarily indicative of criminality. A level two encounter, also known as the common-law right of inquiry, permits a more invasive line of questioning of a person when the officer has a founded suspicion that criminal activity is afoot. A level three encounter allows the police to forcibly stop and detain a person if the officer has a reasonable suspicion that the person has committed, is committing, or is about to commit a crime. Finally, under a level four encounter, an arrest is authorized when the police

have probable cause to believe a person has committed a crime (*De Bour*, 40 NY2d at 223).

Applying these oft-cited and well recognized principles, I believe that even if the police were justified at the inception of their contact with defendant in making a reasonable inquiry, the nature of the interaction thereafter did not raise the level of allowable intrusion to a level three. At level three, the facts supporting reasonable suspicion would have been required before the police could have detained defendant. Moreover, since the police physically grabbed defendant's wrists, patted down his arm, rolled up his sleeves and removed the machete, a particularized reasonable belief that defendant was armed and dangerous would have been required (*see People v Russ*, 61 NY2d 693, 695 [1984]; *People v Gonzalez*, 295 AD2d 183, 184 [1st Dept 2002]).

"[R]easonable suspicion [to justify a seizure] has been aptly defined as the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity is at hand" (*Matter of Jaquan M.*, 97 AD3d 403, 406 [1st Dept 2012], *appeal dismissed* 19 NY3d 1041 [2012], quoting *People v Sobotker*, 43 NY2d 559, 564 [1978]). It is well settled that a private citizen has the constitutional right not to respond to police inquiries (*Illinois v Wardlow*, 528 US 119, 125 [2000]; *People v Major*, 115 AD3d 1, 5 [1st Dept 2014]). "[W]hile the police [have] the right to make the inquiry, defendant ha[s] a constitutional right not to respond" (*People v Howard*, 50 NY2d 583, 590 [1980], *cert denied* 449 US 1023 [1980]). The Court of Appeals has described the right to be left alone as the "distinguishing factor" between the lower levels of limited permissible police intrusion that authorize investigatory questioning and the right to forcibly detain, which requires a reasonable and articulable basis to suspect involvement in criminal activity (*see People v Major*, 115 AD3d at 5; *People v Moore*, 6 NY3d 496, 500 [2006]).

At bar, defendant's conduct in retreating into the elevator to go to another floor, his physically turning away from the police when they found him, and his refusal to respond to police commands or questions during this process all constitute permissible avoidance behavior. We do not agree with the majority that these facts justify a conclusion of "flight" or "active escape." In *People v Johnson* (109 AD3d 449 [1st Dept 2013], *appeal dismissed* 23 NY3d 1001 [2014]), this Court held that a person's desire to avoid contact with the police is not an objectively credible reason for making a level one inquiry. We also held that the fact that the avoidance behavior occurs in a high-

crime neighborhood, including where trespassing and drug activity occur, does not elevate police avoidance conduct into a level one inquiry (*id.* at 450; *Matter of Michael F.*, 84 AD3d 468 [1st Dept 2011]). A fortiori, conduct that does not support a level one encounter cannot support the level three encounter that occurred in this case.

Even if the recent Court of Appeals decision in *People v Barksdale* (26 NY3d 139 [2015]) in any way limited our holding in *Johnson*, the result would still be the same in this case. In *Barksdale*, the Court of Appeals held that in a private building voluntarily participating in a police protection program, and otherwise restricted by signage and a lock, a level one encounter was supported by the "coupling of defendant's presence in the subject building with the private and protected nature of that location" (*id.* at 143-144). In *Barksdale*, it was the defendant's answers to police inquiry that provided the probable cause necessary for arrest, and the weapon recovered was only incident to and after that arrest. At bar, even assuming that under *Barksdale*, defendant's conduct may have been sufficient to support a level one inquiry, the nonresponsive conduct by defendant did not raise the level of permitted police intrusion to level three. In fact, given that defendant actually lived in the building, if he had truthfully answered the police, questioning would have presumably stopped. If a defendant's resistance to answering the police could in itself be relied upon to justify the frisk, then the right to inquire "would be tantamount to the right to seize, and there would, in fact, be no right 'to be let alone.' That is not, nor should it be, the law" (*People v Holmes*, 81 NY2d 1056, 1058 [1993], *affg* 181 AD2d 27 [1st Dept 1992]). This is so because the *De Bour/Hollman* framework requires escalating measures of suspicion as necessary to justify each graduated level of intrusion (*People v Garcia*, 20 NY3d 317, 322 [2012]). We agree with the majority that encounters between private citizens and police are dynamic, but the dynamics of every encounter do not necessarily escalate every encounter to the point of an authorized stop and frisk.

The further observation of an otherwise unidentifiable bulge on defendant's arm did not give the officers reason to believe that defendant had committed a crime or that he was in possession of a weapon justifying a frisk (*People v Crawford*, 89 AD3d 422 [1st Dept 2011]). Even at close range, the shape of the bulge was not readily discernable to the officers and "bore no obvious hallmarks of a weapon" (*Matter of Jaquan M.*, 97 AD3d at 408; *see People v Fernandez*, 87 AD3d 474 [1st Dept

2011]). Without any further indication that defendant was armed and posed a threat to the safety of others, such as seeing "the outline of a gun," the seizure was not authorized (*People v Blackman*, 61 AD2d 916, 916 [1st Dept 1978]). The officer's stated concern that defendant had a weapon was not supported by any corroborative observations, such as sudden movements or threatening gestures (*see People v Benjamin*, 51 NY2d 267, 271 [1980]; *People v Smith*, 267 AD2d 98 [1st Dept 1999], *lv denied* 95 NY2d 804 [2000]). The record is devoid of testimony that defendant moved or adjusted his arm where the bulge was observed, or that he even moved at all. Officer Rodriguez's expressed fear for his own safety, without the supporting objective information, does not justify a required finding of a particularized reasonable suspicion (*see People v Oquendo*, 221 AD2d 223, 224 [1st Dept 1995], *appeal dismissed* 88 NY2d 1004 [1996]).

There were no other additional objective indicia of criminality present to justify the officer's actions in this case. From the moment the officers first saw defendant in the elevator up until the time of his arrest, the officers simply had no knowledge that there had been a robbery in the area or that defendant matched the complainant's description of one of his assailants. It was only after defendant had been arrested that Officer Rodriguez learned for the first time, through a telephone conversation with Sergeant Hyland, about defendant's potential involvement in the robbery (*compare People v Joyce*, 58 AD3d 476 [1st Dept 2009], *lv denied* 12 NY3d 818 [2009]; *People v Santiago*, 253 AD2d 673 [1st Dept 1998], *lv denied* 92 NY2d 985 [1998]). Clearly, a different circumstance regarding police intrusion would have been present had this information been known before defendant was actually arrested.

Accordingly, I would reverse the November 29, 2006 conviction of robbery in the first degree and grant defendant's motion to suppress physical evidence, the showup identification and statements he made to the police, and remand this matter for a new trial, preceded by an independent source hearing.