People v Bonilla (2024 NY Slip Op 03565)

People v Bonilla

2024 NY Slip Op 03565

Decided on July 3, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 3, 2024

112565
[*1]The People of the State of New York, Respondent,
v
Harry Bonilla, Appellant.

Calendar Date:May 31, 2024

Before:Egan Jr., J.P., Reynolds Fitzgerald, Ceresia, Fisher and Mackey, JJ.

Tina K. Sodhi, Alternate Public Defender, Albany (Steven M. Sharp of counsel), for appellant.
P. David Soares, District Attorney, Albany (Emily Schultz of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the Supreme Court (Roger D. McDonough, J.), rendered July 28, 2020 in Albany County, upon a verdict convicting defendant of the crimes of attempted kidnapping in the second degree as a sexually motivated felony, sexual abuse in the first degree and assault in the third degree.
Defendant approached a 16-year-old girl on the street, grabbed her buttocks, tried to force her into his car and punched her. As a result, defendant was charged by indictment with attempted kidnapping in the second degree as a sexually motivated felony, sexual abuse in the first degree and assault in the third degree. After a jury trial, he was convicted as charged. At sentencing, the People waived their right to seek persistent felony offender status and, in exchange, defendant agreed to be sentenced to a prison term of 15 years followed by 20 years of postrelease supervision for the attempted kidnapping conviction, a consecutive prison term of five years followed by 15 years of postrelease supervision for the sexual abuse conviction, and a lesser concurrent term of incarceration for the assault conviction. Defendant appeals.
Initially, defendant contends that the evidence is legally insufficient to support his convictions for attempted kidnapping and sexual abuse and that the convictions are against the weight of the evidence. Defendant's legal sufficiency claims with respect to the attempted kidnapping charge are unpreserved, but our weight of the evidence analysis nevertheless involves consideration of whether the proof supports each of the elements of the crimes (see People v Stone, 179 AD3d 1287, 1288 [3d Dept 2020]; People v Stover, 174 AD3d 1150, 1151 [3d Dept 2019], lv denied 34 NY3d 954 [2019]). With that said, "[w]hen assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crimes proved beyond a reasonable doubt" (People v Lewis, 224 AD3d 1143, 1144 [3d Dept 2024] [internal quotation marks, brackets and citations omitted]). As for our evaluation of the weight of the evidence, "we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Jenkins, 215 AD3d 1118, 1119 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 997 [2023]).
The victim testified as follows. On December 4, 2018, she got out of night school at around 7:15 p.m. and was walking home alone when defendant approached her on foot. Defendant attempted to speak with the victim, asking her how old she was. She responded that she was 16, and defendant [*2]then stated that she looked too good to be 16 years old. The victim continued walking and, as she did so, she heard the sound of a vehicle door unlocking. Assuming that it was defendant's vehicle, the victim turned and went the wrong way down a one-way street so that defendant could not follow her in his vehicle. She also made a few phone calls in an attempt to "talk until [she] got home and [to] feel safe," but the people whom she called did not answer.
When the victim reached the end of the block, she saw defendant walking toward her again, coming from the direction of a black SUV. Defendant said he wanted to talk to her and stated, "let's get in the car," and then remotely unlocked the SUV. The victim kept walking but defendant caught up to her, grabbed her buttocks and said, "that felt nice." The victim responded, "that's sexual harassment," but defendant grabbed her buttocks again. As the victim tried to hurry away from defendant, he told her he had a gun and threatened to blow her brains out if she did not put her phone away. Defendant then took hold of the victim's wrist and dragged her to within five feet of the SUV. When the victim fought back against defendant, he grasped her hair with both hands and continued pulling her, telling her to stop making a scene and calling her an expletive. The victim dropped to the ground and defendant finally let go of her. The victim then stood up, whereupon defendant punched her in the mouth. She turned and fled to a nearby playground, called 911 and hid until police arrived.
Surveillance footage of the area in question was introduced at trial, which depicted two individuals appearing to struggle, with one person making quick movements and seeming to fall down at one point, and then apparently being dragged by the other person before eventually running away. During her testimony, the victim identified herself as the person being dragged and defendant as the attacker. The victim also identified defendant in court.
In addition to the victim's testimony and the surveillance video, the People introduced a recording of the victim's 911 call from that night. In a frantic voice and while breathing heavily, the victim said that she was hiding in a park and stated that she almost got kidnapped and that a guy "touched [her] butt," grabbed her, pulled her toward his vehicle and hit her. A responding patrol officer testified that the victim was hiding at the playground when he arrived and he had to call out and tell her it was safe to come out, whereupon he found her hysterically crying with a laceration on her lip. According to testimony from other officers, the victim gave the police a detailed description of the perpetrator and the black SUV, and they located video camera footage which depicted a matching vehicle. From that video, the police were able to ascertain the license plate and traced it to defendant's housemate.
Defendant's parole officer testified that while defendant was incarcerated awaiting trial [*3]in this case, she visited him in jail to serve him with parole violation paperwork. Upon encountering defendant, the officer asked him how he was doing, and defendant replied, "not great." The officer asked why, and defendant stated that he was being unfairly portrayed in the media and then went on to provide a different version of the events of the night in question, in which he described a mutually flirtatious encounter with the victim. Defendant continued, stating that he touched the victim's hair and butt, but she then spit in his face and so he "popped her."
Regarding the issue of legal sufficiency, as relevant here, sexual abuse in the first degree is defined as "subject[ing] another person to sexual contact . . . [b]y forcible compulsion" (Penal Law § 130.65 [1]). Defendant's sole argument is that the evidence failed to support the forcible compulsion element of this charge. Forcible compulsion "means to compel by the 'use of physical force' " (People v Christie, 224 AD3d 1097, 1098 [3d Dept 2024], quoting Penal Law § 130.00 [8] [a]) or by "a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped" (Penal Law § 130.00 [8] [b]). Defendant's position is that this element was not established because there was no proof that he used force or made threats before he grabbed the victim's buttocks — that is, the purported threatening and dragging of the victim came afterward. The People respond that forcible compulsion was sufficiently proven through evidence of an implied threat. "The determination of whether such an implied threat existed involves a subjective inquiry into what a victim feared a defendant might have done if he or she did not comply . . . consider[ing] all relevant factors including the age of the victim, the relative size and strength of the defendant and victim, and the nature of the defendant's relationship to the victim" (People v Porter, 82 AD3d 1412, 1413 [3d Dept 2011] [internal quotation marks, brackets and citations omitted], lv denied 16 NY3d 898 [2011]; see People v Machia, 206 AD3d 1272, 1276 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]; People v Miller, 226 AD2d 833, 836 [3d Dept 1996], lv denied 88 NY2d 939 [1996]).
Here, the victim was young, alone and vulnerable, having been approached by an unknown adult man on a darkened street. As reflected in the victim's testimony, by the time defendant grabbed her buttocks, she had been actively trying to evade him and did not feel safe. The victim also testified that when defendant touched her buttocks, "[h]e punched at it like, like grabbed at it." The jury also had the opportunity to compare the relative sizes of the victim — who, according to the People's sentencing memorandum, had a childlike appearance — and defendant — who, the record reveals, was 32 years old, six feet tall and 205 pounds. Under these circumstances, there [*4]was ample proof that the victim feared for her own safety to support the element of forcible compulsion by means of an implied threat (see People v Machia, 206 AD3d at 1276; People v Porter, 82 AD3d at 1414).
As to the weight of the evidence, a different verdict would not necessarily have been unreasonable. Nevertheless, deferring to the jury's assessment of the credibility and demeanor of the victim and other witnesses, we find that the verdict is supported by the weight of the evidence (see People v Hartle, 159 AD3d 1149, 1153 [3d Dept 2018], lv denied 31 NY3d 1082 [2018]; People v Manning, 151 AD3d 1936, 1938 [4th Dept 2017], lv denied 30 NY3d 951 [2017]).
Moving on, defendant's assertion that the attempted kidnapping conviction merged with the sexual abuse and assault convictions is unpreserved (see People v Hanley, 20 NY3d 601, 606 [2013]) and, in any event, lacks merit. The merger doctrine applies when acts constituting the crime of kidnapping are "so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them" (People v Gonzalez, 80 NY2d 146, 153 [1992] [internal quotation marks and citation omitted]; see People v Hanley, 20 NY3d at 605-606). Although the acts constituting each of the crimes of conviction herein occurred in relatively quick succession, defendant's attempted abduction of the victim was not "simultaneous and inseparable" from the other crimes (People v Place, 152 AD3d 976, 980 [3d Dept 2017] [internal quotation marks and citation omitted], lv denied 30 NY3d 1063 [2017]; see People v Thorpe, 141 AD3d 927, 932 [3d Dept 2016], lv denied 28 NY3d 1031 [2016]). The sexual abuse was completed after defendant grabbed the victim's buttocks. Defendant then committed the attempted kidnapping by dragging the victim toward the SUV. When defendant let go of the victim, the attempted kidnapping ceased at that point. The assault then occurred after the victim got back to her feet and defendant proceeded to punch her. Given that each crime was discrete, and the attempted kidnapping was not merely "the incidental means employed to facilitate the commission of" the sexual abuse and assault (People v Cassidy, 40 NY2d 763, 768 [1976]), the merger doctrine does not apply (see People v Smith, 47 NY2d 83, 87-88 [1979]). We reject defendant's related claim that trial counsel was ineffective in not raising this issue, as counsel will not be faulted for failing to advance a meritless claim (see People v Place, 152 AD3d at 980).
Next, defendant makes two arguments pertaining to the People's statement of trial readiness. First, defendant asserts that, after the People filed the mandated certificate of compliance, Supreme Court failed to inquire of the People on the record as to their actual readiness for trial (see CPL 30.30 [5]; 245.20; 245.50 [3]; People v McCarty, 221 AD3d 1360, 1361 [3d Dept 2023], lv denied 40 [*5]NY3d 1093 [2024]). This claim, however, is not preserved for our review, nor does it, as defendant insists, constitute a mode of proceedings error that is exempt from the preservation requirement (see People v Gray, 86 NY2d 10, 20-22 [1995]; see also People v Grumberg, 153 AD3d 1525, 1526 [3d Dept 2017]).
Second, defendant contends that the People's certificate of compliance and accompanying statement of trial readiness were illusory because the People violated the automatic discovery requirements of CPL 245.20 by failing to disclose the names of members of the Guilderland Police Department who were present when he was arrested. As part of their discovery obligations, the People are required to disclose the names of "all law enforcement personnel whom the prosecutor knows to have evidence or information relevant to any offense charged or to any potential defense thereto" (CPL 245.20 [1] [d]). The officers in question did not fall within the ambit of the statute. Albany detectives had advised the Guilderland officers that they would be traveling into their jurisdiction in order to arrest defendant. Although the Guilderland officers were present and had been talking to defendant when the Albany detectives arrived to make the arrest, as confirmed to the prosecutor by the lead Albany detective, the Guilderland officers did not have any knowledge about the case, and nothing in the record indicates to the contrary. Thus, the People were not mandated to disclose the officers' names under CPL 245.20 (1) (d) (see People v Robbins, 206 AD3d 1069, 1072 [3d Dept 2022], lv denied 39 NY3d 942 [2022]; People v McQueen, 80 Misc 3d 225, 230 [Crim Ct, Kings County 2023]; compare People v Elmore, 211 AD3d 1536, 1538 [4th Dept 2022]).
Defendant further argues that Supreme Court erred in allowing the People to elicit the statements he made to his parole officer while incarcerated, as these statements were the product of custodial interrogation that were not preceded by Miranda warnings. We disagree. The parole officer greeted defendant in general fashion by asking how he was doing. After receiving a response from defendant that he was "not great," the officer asked a single, innocuous follow-up question, "why?" It is clear that the officer, whose sole purpose in visiting defendant was to serve him with parole paperwork, was not questioning defendant about anything having to do with this case and her questions were not " 'reasonably likely to evoke an incriminating response' " (People v Huffman, 61 NY2d 795, 797 [1984], quoting Rhode Island v Innis, 446 US 291, 301 [1980]; accord People v George, 127 AD3d 1496, 1497 [3d Dept 2015]; see People v Perez, 142 AD3d 410, 416 [1st Dept 2016], affd 31 NY3d 964 [2018]; People v Taylor, 1 AD3d 623, 624 [3d Dept 2003], lv denied 1 NY3d 602 [2004]).
We have considered defendant's remaining contentions, including his claims that certain evidentiary rulings by Supreme Court were erroneous and deprived him of a fair trial. Having [*6]done so, we find them to be unpersuasive.
Egan Jr., J.P., Reynolds Fitzgerald, Fisher and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.